**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CURTIS LYNN FAUBER,
*Petitioner-Appellant*,

v.

RONALD DAVIS, Warden, California
State Prison at San Quentin,
*Respondent-Appellee.*

No. 17-99001

D.C. No.
2:95-cv-06601-
GW

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted January 24, 2022
Pasadena, California

Filed August 5, 2022

Before: Paul J. Watford, Daniel A. Bress, and
Danielle J. Forrest, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge Watford

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed the district court's judgment denying Curtis Fauber's habeas corpus petition challenging his murder conviction and death sentence.

The district court certified four claims for appeal.

Claims 10(a) and (c) and Claim 41(a)(1)(16) all concerned the prosecutor's alleged improper vouching for the credibility of witness Brian Buckley by reading to the jury the plea agreement in which Buckley agreed to testify against Fauber. In Claim 41(a)(1)(16), Fauber argued that trial counsel was ineffective for failing to object to the alleged vouching. The panel held that under Antiterrorism and Effective Death Penalty Act (AEDPA), the California Supreme Court's decision rejecting Fauber's ineffective assistance claim was not contrary to or an unreasonable application of clearly established law; the California Supreme Court could reasonably conclude that even if counsel acted deficiently, there was no prejudice. In Claims 10(a) and (c), Fauber argued that the alleged vouching, and the state court's allowance of the same, violated Fauber's due process rights. The panel held that Fauber procedurally defaulted his due process vouching claims, and that even if the due process claims were not procedurally defaulted, they would fail on the merits because the alleged vouching was harmless.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

In Claim 28(c), Fauber argued that the state trial court improperly excluded his unaccepted plea offer as mitigating evidence at the penalty phase.  The panel held that no clearly established federal constitutional law holds that an unaccepted plea offer qualifies as evidence in mitigation that must be admitted in a capital penalty proceeding.  The panel held that regardless, Fauber cannot show prejudice.  The panel wrote that given the extreme aggravating factors that the State put forward coupled with Fauber's already extensive but unsuccessful presentation of mitigating evidence, there is no basis to conclude that the jury would have reached a different result if it had considered Fauber's unaccepted plea.

The panel denied Fauber's request to expand the certificate of appealability to include four additional claims.

Dissenting in part, Judge Watford would grant Fauber's habeas petition as to the exclusion of the plea offer at the penalty phase.  Noting that the prosecutor argued that Fauber must be executed because he was likely to kill again if sentenced to life in prison, Judge Watford wrote that the trial court's exclusion of the prior offer of a plea deal with a life sentence prevented Fauber from rebutting this claim, thereby violating clearly established federal law, an error that was not harmless.

**COUNSEL**

John S. Crouchley (argued) and Ajay V. Kusnoor, Deputy Federal Public Defenders; Cuauhtemoc Ortega, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Jonathan Matthew Krauss (argued), A. Scott Hayward, and Xiomara Costello, Deputy Attorneys General; James William Bilderback II and Dana M. Ali, Supervising Deputy Attorneys General; Lance W. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

**OPINION**

BRESS, Circuit Judge:

   In 1988, a California jury sentenced Curtis Fauber to death for murdering Thomas Urell with an ax. The California Supreme Court affirmed Fauber's conviction and sentence on direct appeal and later denied his state habeas petition. Fauber now seeks federal habeas relief. He argues that the state prosecutor improperly vouched for a witness's credibility, that his attorney was ineffective in not objecting to the vouching, and that the state trial court, in the penalty phase, improperly excluded the prosecution's earlier plea offer to Fauber as claimed mitigating evidence.

   We hold that Fauber's claims lack merit. The state court's decisions are not contrary to or an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), and one of Fauber's claims is procedurally defaulted. We affirm the judgment of the district court.

I

A

   More than thirty years ago, Curtis Fauber and his friend Brian Buckley broke into Thomas Urell's home to steal drugs. When Urell woke up and discovered the intruders, Fauber bludgeoned Urell to death with the blunt side of an ax. Extensive evidence connected Fauber to the crime, including Buckley's testimony (which was corroborated in key parts by unindicted confederate Mel Rowan), Urell's autopsy, various pieces of physical evidence, and Fauber's own admissions. We now summarize the facts based on the record before us and the California Supreme Court's

decision on Fauber's direct appeal. *See People v. Fauber*, 831 P.2d 249 (Cal. 1992).

Fauber and Buckley met in the Army in January 1985. They became close friends, with Fauber visiting Buckley's family during breaks in service. In June 1985, the Army discharged Fauber and Buckley, and the two went to Buckley's mother's apartment in Ventura. After spending time in his home state of New Mexico, Fauber later returned to Ventura in the early summer of 1986 to stay with Buckley.

That summer, Fauber and Buckley regularly used drugs with Buckley's neighbors, Jan Jarvis and Mel Rowan. At one point, Jarvis mentioned that she had a former boyfriend named Thomas Urell who sold cocaine. Fauber was intrigued by the possibility of robbing Urell and asked where he lived. Jarvis drew a map showing the location and layout of Urell's house. The group talked about robbing the home and a week later, all four of them drove by Urell's house to scout it. Rowan told Fauber to "rip off" Urell immediately, but Fauber said: "No, we want to check it out for a few days." Buckley and Fauber surveilled the house two more times before the murder.

Approximately four days later, in the nighttime on July 16, 1986, Buckley and Fauber put their plan into motion. Fauber drove with Buckley to a store near Urell's home and parked his motorcycle there. They went to an adjacent beach and donned gloves, hats, and bandannas. Fauber carried a sawed-off shotgun. Fauber mentioned that he might have to kill Urell to prevent him from being a witness.

The two men walked to Urell's home and entered through a window. Buckley followed Fauber to the bedroom, where Jarvis had said the drugs would be located. They entered and found Urell sleeping in bed. As they

entered, Urell woke up. In a fake Mexican accent, Fauber said: "Don't move." Urell pleaded with Fauber not to hurt him and said they could take anything they wanted. Buckley held the shotgun, and Fauber forced Urell onto his stomach and taped his hands behind his back.

With Urell detained, Fauber and Buckley searched the residence and took assorted items, including a small amount of cocaine. They also found a locked safe. Urell said it had nothing valuable in it and that he did not know the combination. Fauber then found an ax under the bed. Fauber held the ax above Urell and, without warning, bludgeoned him in the back of the neck with the ax's blunt side. Buckley heard the blow and left the room as Urell began making a hissing noise. Seconds later, Fauber delivered a second blow, which silenced Urell.

Fauber met Buckley in the kitchen and suggested putting the safe in Urell's vehicle. When Buckley asked him whether Urell was dead, Fauber said he did not know. Fauber then returned to the bedroom and Buckley heard Fauber hit Urell several more times with the ax. Fauber and Buckley loaded the safe onto Urell's El Camino and drove to Buckley's apartment.

Upon arrival around 1:00 a.m., Fauber and Buckley went to Rowan's apartment to obtain a key to a basement storeroom. Rowan saw a safe in the back of Urell's El Camino and asked Fauber if Urell had been home during the burglary. Fauber responded that Urell had not been home. Fauber and Buckley took everything they had stolen from Urell's residence and put it in a trailer owned by Buckley's mother. They then left to dispose of Urell's El Camino over a cliff.

After returning to the apartment, Fauber and Buckley used Urell's cocaine. At this point, Rowan returned and pressed Fauber about Urell's whereabouts. Fauber then admitted that Urell had been home. He also admitted that he had hit Urell with an ax and believed he had killed him. Fauber told Rowan he had killed Urell because Urell saw his face, and Fauber "was not ready to leave Ventura yet." Fauber also acknowledged that Urell was struggling to breath when he left.

The next day, Fauber discovered how to open the safe. After emptying its contents, Fauber and Buckley took the safe to another town and dumped it near a lake because Rowan did not want it in his storeroom. The safe contained small amounts of jewelry, gold, and silver coins; Jarvis was directed to throw most of it away.

When Urell did not appear for work the next day, Urell's friend Ronald Siebold went to his home and found Urell's lifeless body lying face down with his hands taped behind his back and a pillow on his head. The police arrived ten minutes later. Sheriffs who responded to the call described the room as "ransacked"—with drawers thrown open and clothes turned out—consistent with a robbery. They found an ax standing upright at the foot of the bed. Another police detective found the remnants of narcotics paraphernalia.

The Chief Medical Examiner for Ventura County, Dr. Frederick Lovell, examined Urell's body at the scene. He confirmed that Urell had died roughly 14 to 22 hours earlier. He also observed that Urell's shoulders and chest had a blue hue, suggesting that his blood lacked sufficient oxygen when he died.

Dr. Lovell also conducted an autopsy. The autopsy demonstrated that Urell's hands had been tied behind his

back before he was killed. Blood splatter indicated that Urell had been struck repeatedly in the back of the neck. Wounds on Urell's lower left neck extending towards the skull evidenced closely grouped blows caused by a major force from a rectangular object. The wounds likely were struck from the same position and were consistent with the blunt side of an ax. The blows had prompted a "large amount of bleeding and hemorrhag[ing]," causing paralysis and limiting Urell's ability to breath. Urell also had a broken neck and "one bone was separated from the other where they're normally tied together by a series of very heavy, tough ligaments." Dr. Lovell concluded that based on the "heavy purple discoloration of the face and chest," the "extreme engorgement of the eyes" with bleeding under the skin, and the widespread hemorrhaging, Urell had died of either asphyxia or suffocation.

Over the next few weeks, police began to connect Fauber to the murder. On July 20, 1986, they found Urell's El Camino 125 feet off the side of a cliff. Then, on July 31, they found the door to Urell's safe at a nearby lake. Eventually, the police arrested Hal Simmon, an acquaintance of Fauber's, after discovering that Simmon had been using Urell's telephone calling card. Simmon told the police he had received the number from "Brian and Curtis" and described where they lived. This led authorities to Fauber and Buckley.

In September 1986, police arrested Buckley for a traffic violation. Buckley provided details about Urell's murder, believing the information would not be used against him. That same month, police arrested Rowan for a parole violation. Rowan admitted his involvement in the robbery and discussed the murder.

With the evidence mounting, the Ventura County police sent a warrant for Fauber's arrest to his hometown of Española, New Mexico. Española police arrested Fauber, and officers then flew to New Mexico to interview him and take possession of any incriminating property. Fauber waived his *Miranda* rights. He admitted to police that Jarvis had told him about someone who had a lot of drugs and had drawn him a diagram to help him commit the robbery. He recalled that he and Buckley followed Jarvis and Rowan as they drove past the house.

Police found a piece cut from Urell's calling card in Fauber's wallet. In a camper that Fauber used in Ventura, police also found a road atlas that belonged to Urell and that was stamped with the name of his employer.

B

On January 7, 1987, the Ventura County District Attorney (DA) charged Fauber with murder, robbery, and burglary, and filed a notice of intent to seek the death penalty. Fauber pleaded not guilty. In November 1987, police arrested Buckley in connection with Urell's murder. As part of his plea agreement for second-degree murder, Buckley agreed to testify against Fauber. The prosecution granted Rowan full immunity on the condition that he too testify against Fauber.

Fauber's trial began in mid-December 1987. The prosecution offered Rowan and Buckley as its principal witnesses. Both confirmed the details of the murder and Fauber's involvement. Relevant to Fauber's vouching and ineffective assistance of counsel claim, the prosecution read Buckley's plea agreement to the jury and utilized the plea agreement in the State's closing argument. We will discuss the facts relating to this issue in greater detail below in our

analysis of the vouching-related claims.  The jury convicted Fauber of first-degree murder, robbery, and burglary. *Fauber*, 831 P.2d at 257.

C

The trial then moved to the penalty phase for a determination of whether Fauber should be sentenced to death.  In this phase, the State presented evidence that Fauber took part in two uncharged killings, among other violent misdeeds.

The prosecution presented evidence that a few months before he returned to Ventura, Fauber murdered his longtime friend, Jack Dowdy, Jr., and threatened Jack's wife, Kim. Witnesses testified that Fauber had fallen in love with Kim and wanted her to move with him to Albuquerque.  When Kim did not agree, Fauber resorted to threats and violence, pulling a gun on Jack, holding Kim at gunpoint, appearing at Kim's house unannounced and trying to choke her while she slept, and telling Jack that he had ruined Fauber's chances with Kim and that he would therefore kill her.

Around this time, Jack disappeared.  Fauber found Kim and told her suggestively that Jack would not bother her anymore.  A couple of days later, Fauber confronted Kim again and gave her an ultimatum: come with him or he would kill everyone in her house.  He then put a knife to her throat until she agreed to leave with him.  In the middle of May 1986, Kim's uncle Tony confronted Fauber and asked him to stop terrorizing his family.  Fauber refused.  Then, Fauber admitted to Tony that he killed Jack.  Fauber also later told Buckley that "he had killed the husband of a girl named Kim because Kim was afraid of her husband, who had been a friend of [Fauber's]."  Fauber asked Buckley to help him dig up the body and re-bury it so animals would not expose it.

At the penalty phase, the prosecution also presented evidence that Fauber murdered an acquaintance named David Church at a Memorial Day party at Buckley's apartment in 1986. According to witnesses, Church had appeared drunk at the party and demanded drugs. When Church threatened to go to the police, Fauber and his friend, Chris Caldwell, took Church away.

Police found Church's decomposed body in a creek bed months later. Buckley testified that Fauber told him he killed Church with an ax handle, that Church "was a hard guy to kill," and that he needed to get rid of the ax because it was covered in blood. Buckley testified that Caldwell had also told him about the killing. Another witness from the party, Pam McCormick, testified that she overheard a conversation in which Fauber discussed how to get rid of a body.

In response to the State's case in aggravation, Fauber's counsel presented mitigating evidence concerning Fauber's troubled childhood and possible mental instability, and to emphasize Fauber's positive qualities. It is uncontradicted that defense counsel called twenty-seven witnesses to testify on Fauber's behalf, including friends and family, a social anthropologist who had conducted an eight-month investigation into Fauber's upbringing, and a psychologist who administered intelligence and neuropsychological screening tests on Fauber.

At the penalty phase, Fauber also wanted to present evidence that the prosecution had initially made him a plea offer that would have allowed Fauber to avoid the death penalty in exchange for testifying against Caldwell and Buckley, and that Fauber refused the offer. The trial court disallowed this, finding that the plea agreement was "totally irrelevant" because it "does not relate to the defendant's

character, prior record or circumstance of the offense." The trial court's exclusion of Fauber's unaccepted plea agreement forms the basis for another assignment of error, and we will set forth more facts relating to this issue below in our analysis.

The jury sentenced Fauber to death.

## D

The California Supreme Court affirmed Fauber's convictions and sentence on direct appeal, *People v. Fauber*, 831 P.2d 249 (Cal. 1992), and the United States Supreme Court denied certiorari. *Fauber v. California*, 507 U.S. 1007 (1993). In January 1993, Fauber filed a state habeas petition, which the California Supreme Court summarily denied on the merits.

Fauber filed his original federal habeas petition in May 1997, which the district court stayed so that Fauber could exhaust state post-conviction remedies. Fauber then filed a first amended federal habeas petition. Following a round of rulings by the district court, Fauber filed his operative second amended federal habeas petition in 2012.

In May 2017, the district court denied Fauber's petition. The district court then certified four claims for appeal:

> Claims 10(a), (c): whether the prosecutor improperly vouched for Buckley's credibility by reading Buckley's plea agreement to the jury.
>
> Claim 41(a)(1)(16): whether trial counsel was ineffective for failing to object to the alleged vouching.

Claim 28(c): whether Fauber's plea offer was improperly excluded as mitigating evidence at the penalty phase.

In this court, Fauber presses all four certified claims and seeks a certificate of appealability on four additional claims.[1]

## II

"We review a district court's denial of a 28 U.S.C. § 2254 petition de novo." *Bolin v. Davis*, 13 F.4th 797, 804 (9th Cir. 2021). But unless otherwise indicated below, we evaluate Fauber's claims under the deferential standard of review in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), because Fauber filed his federal habeas petition after AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under AEDPA, a federal habeas petitioner cannot obtain relief unless the state court's decision (1) is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) is "based on an unreasonable determination of the facts

---

[1] Fauber requests that we expand the certificate of appealability to include whether his counsel was ineffective in failing to present additional mitigating evidence and not further rebutting the prosecution's aggravating evidence; whether the district court should have granted a hearing on the destruction of certain physical evidence; and whether the cumulative effect of trial counsel's performance during the penalty phase warrants relief. We have carefully reviewed these assignments of error, including by ordering supplemental briefing. We now **DENY** Fauber's request to expand the certificate of appealability because he has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

To meet AEDPA's "'unreasonable application of' prong, a petitioner 'must show far more than that the state court's decision was merely wrong or even clear error.'" *Bolin*, 13 F.4th at 804 (quoting *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (per curiam)). The state court's application of federal law must stand unless it was "objectively unreasonable." *Bell v. Cone*, 535 U.S. 685, 698–99 (2002). To prevail, Fauber must demonstrate that the state court's decision "is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Kayer*, 141 S. Ct. at 523 (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011)). "This is a challenging standard to meet." *Bolin*, 13 F.4th at 805.

## III

We begin with Claims 10(a) and (c) and Claim 41(a)(1)(16), which all concern the prosecution's alleged vouching using Buckley's plea agreement, and defense counsel's alleged ineffectiveness in failing to object to the same. We hold that under AEDPA, the California Supreme Court's decision rejecting Fauber's ineffective assistance claim was not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). We further hold that Fauber procedurally defaulted his due process vouching claims but that regardless, Fauber cannot show prejudicial error.

## A

We first set forth the relevant facts and rulings relating to these claims. Buckley's plea agreement stated that prosecutors would conduct a preliminary interview with him

to assess his credibility. If the DA did not find Buckley credible, then Buckley's case would proceed to trial. The plea agreement provided that during Fauber's trial, the judge who heard Buckley's testimony would "make any necessary findings as to his truthfulness" for purposes of Buckley honoring his plea agreement, if there were a dispute between Buckley and the State. At Fauber's trial, and during the government's direct examination of Buckley, the prosecutor read the plea agreement to the jury and Buckley confirmed that he entered it. Defense counsel did not object.

The prosecution returned to Buckley in its closing argument. The prosecutor told jurors that Brian Buckley's credibility was the key to the case, stating at the outset: "If you don't believe anything he says, you'll probably acquit the defendant. If you believe some of what Brian Buckley says, you'll find the defendant guilty of robbery and burglary and felony murder. And if you believe most of what Brian Buckley says, you'll convict the defendant of everything."

Next, the prosecutor rhetorically asked the jury: "what would motivate Brian Buckley to frame somebody who was his good friend, his Army buddy, and in fact somebody who was his good friend into August at least?" The prosecutor told the jury to "remember that Brian Buckley has a motivation in this case to testify truthfully. And truth is not according to the DA, [or] to me. Truth is according to the Judge." The prosecution cited Buckley's plea agreement and said that "the most important part of that agreement is that if there is some dispute as to Brian Buckley's truthfulness, that dispute will be determined by the trier of fact, the Judge who hears the proceedings in which Brian Buckley testifies." Later, the prosecutor revisited this point and noted that the "main element" of Buckley's plea agreement was that he had to testify truthfully. The

prosecutor then read the agreement aloud, stopping to note that the trial judge's assessment of Buckley's candor was key to the plea agreement.

The prosecutor in closing argument emphasized record evidence that, in the State's view, showed that Buckley and Rowan were credible witnesses. The prosecutor argued that Buckley's testimony was credible because it was supported "in almost all the details" by Rowan's testimony. Further, the prosecution pointed out, Buckley's core testimony was confirmed by Fauber himself when he waived his *Miranda* rights and admitted that Jarvis drew him a map of Urell's house that Fauber then used to scope out Urell's residence.

The prosecutor at closing also underscored the importance of Fauber's confession to Rowan that he had killed Urell. The prosecutor read some of Rowan's more critical testimony aloud and argued that Fauber's admission to Rowan was consistent with the autopsy results. Rowan had testified that Fauber admitted he thought he killed Urell, and that Urell was "having a hard time" breathing. The autopsy found that Urell had died of either suffocation or asphyxiation.

Before the prosecution's case and during final instructions, the trial judge instructed jurors that they were the "sole judges" of witness credibility:

> Every person who testifies under oath is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness. In determining the believability of a witness, you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness.

The trial judge also read an instruction that explained the factors jurors could use to evaluate witness credibility, including the witness's ability to remember and communicate, bias, motive, attitude, any prior inconsistent statements, and any admission of untruthfulness. As defense counsel would later do, during closing argument the prosecutor reminded jurors of their responsibility to assess witness credibility.

On direct appeal, the California Supreme Court rejected Fauber's vouching claim. *Fauber*, 831 P.2d at 264–66. It held that Fauber forfeited this claim because his counsel had not objected at trial. *Id.* at 264. Alternatively, the Court held that even if the claim were preserved, there was no reversible error. *Id.* The Court acknowledged that, upon a proper objection, the trial court should have excluded the portions of the plea deal suggesting that the district attorney or trial judge would need to find Buckley credible. *Id.* at 265.

But the Court found that any error was harmless. It explained that there was no prejudice because "[t]he prosecutor argued for Buckley's credibility based on the evidence adduced at trial, not on the strength of extrajudicial information obliquely referred to in the plea agreement." *Id.* Further, "common sense suggests" that the jury will assume that the prosecution had found Buckley credible, "else he would not be testifying." *Id.* For these and other reasons, "[t]he jury could not reasonably have understood Buckley's plea agreement to relieve it of the duty to decide, in the course of reaching its verdict, whether Buckley's testimony was truthful." *Id.*

B

We turn first to Fauber's claim that his trial counsel provided constitutionally ineffective assistance under the

Sixth Amendment by not objecting to the prosecutor's reliance on Buckley's plea agreement. Fauber argues that, without the introduction of that agreement, jurors would not have found Buckley to be a credible witness, and that without Buckley's credible testimony, the jury would not have convicted him of Urell's murder or sentenced him to death.

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), provides the governing framework for evaluating this claim. *See Bolin*, 13 F.4th at 804. To prove ineffective assistance, Fauber must "show both that his counsel provided deficient assistance and that there was prejudice as a result." *Richter*, 562 U.S. at 104. Because the State does not argue that counsel adequately performed, we will assume without deciding that counsel's performance was constitutionally deficient and limit our analysis to the prejudice component.

To show prejudice, Fauber must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." *Strickland*, 466 U.S. at 694. This standard is "highly demanding." *Kayer*, 141 S. Ct. at 523 (quotations omitted). "A reasonable probability means a 'substantial,' not just 'conceivable,' likelihood of a different result.'" *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)); *see also Bolin*, 13 F.4th at 804. But under AEDPA, Fauber's showing is heightened. Given the AEDPA overlay, "the question is whether the state court reasonably could have concluded that the evidence of prejudice fell short of *Strickland*'s deferential standard." *Staten v. Davis*, 962 F.3d 487, 500 (9th Cir. 2020).

In this case, the California Supreme Court summarily denied Fauber's ineffective assistance claim on the merits.

AEDPA applies under these circumstances. *Cullen*, 563 U.S. at 187. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. As a result, we must determine "what arguments or theories . . . could have supported the state court's decision; and then [] ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. We hold that the state court's rejection of Fauber's *Strickland* claim was not objectively unreasonable because the California Supreme Court could conclude that Fauber failed to establish *Strickland* prejudice.

1

To begin, the state court could reasonably conclude that the content and context of the alleged vouching makes it unlikely to have had any material impact on jurors. Indeed, that was what the California Supreme Court held on direct appeal when it addressed Fauber's underlying due process vouching claim (after first concluding it was procedurally defaulted). *Fauber*, 831 P.2d at 264–66. The record bears out the California Supreme Court's observation that at closing argument, the prosecutor focused heavily on the body of evidence that the jury had heard. *Id.* at 265. This included the testimony of Buckley and Rowan confirming the circumstances of Urell's murder and Fauber's role in it; Fauber admitting the murder to Rowan; Fauber's own incriminating statements to police; and various other evidence connecting Fauber to the crime.

In addition, the California Supreme Court could fairly reason, as it did on direct appeal, that "common sense" indicates that the jury "will usually assume . . . that the

prosecutor has at some point interviewed the principal witness and found his testimony believable, else he would not be testifying." *Fauber*, 831 P.2d at 265. That the prosecution to some extent reaffirmed a point the jury would likely presume anyway further reduces the prejudicial impact of the State utilizing Buckley's plea agreement at closing.

Any prejudice was further mitigated by the trial court's instructions to the jury—and reminders from both the prosecution and defense—that the jurors were the ultimate arbiters of witness credibility. Jurors were repeatedly told they were the "sole judges" of whether a witness was believable. The trial court further instructed the jury as to the factors they could consider in evaluating each witness's credibility, such as the witness's motive, bias, and ability to remember and communicate.

The repeated admonitions to jurors that they would assess witness credibility further reduces the prejudice associated with the alleged vouching. The California Supreme Court could permissibly conclude that the instructions made it unlikely that jurors believed that someone other than them bore the responsibility for assessing Buckley's veracity. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (applying "the almost invariable assumption of the law that jurors follow their instructions"); *United States v. Shaw*, 829 F.2d 714, 718 (9th Cir. 1987) (holding that vouching was harmless because the instructions "could only be taken by the jury to mean that the credibility of the witness was by no means established by the plea agreement, and that the issue was wholly open for the jury to decide").

Fauber relatedly takes issue with the prosecutor's statement that the trial judge would determine whether

Buckley had testified truthfully in the event of a dispute. He argues that this made the jury believe they had less responsibility to gauge Buckley's credibility. But the context of this statement belies this inference. The prosecutor raised Buckley's plea agreement to underscore that Buckley had an incentive to testify truthfully because the trial court would determine his credibility, in the event of a dispute. *Fauber*, 831 P.2d at 265. As the California Supreme Court validly reasoned on direct appeal, it was obviously "implicit . . . that the need for such a determination would arise, if at all, in connection with Buckley's sentencing, not in the process of trying [Fauber's] guilt or innocence." *Id.* at 265. In other words, "[t]he context of the remarks made it clear that determination would occur if the prosecutor sought to repudiate its agreement with Buckley after trial in defendant's case." *Id.* at 266.

2

The California Supreme Court could also reject Fauber's ineffective assistance claim because the evidence against Fauber was overwhelming, confirming Buckley's testimony and Fauber's guilt irrespective of the prosecution's reliance on Buckley's plea agreement. *Cullen*, 563 U.S. at 198 (holding that petitioner failed to show prejudice due to the extensive evidence that the prosecution presented); *United States v. Young*, 470 U.S. 1, 17–20 (1985) (prosecutorial vouching was harmless in light of the "overwhelming evidence" of guilt); *United States v. Lew*, 875 F.2d 219, 223–24 (9th Cir. 1989) (holding that government's vouching for two witnesses by eliciting testimony about the truthfulness requirements of their plea agreements did not rise to the level of plain error because "there was substantial evidence

against [the defendant] independent of the credibility of" the two witnesses).

To begin, Mel Rowan—testifying under full immunity—corroborated much of Buckley's testimony. Rowan, who was Buckley's neighbor and socialized with Fauber before and after the murder, confirmed the circumstances surrounding the crime. Rowan testified that Jarvis told Fauber and Buckley about Urell. He confirmed that Jarvis drew a map of Urell's house and a layout of the interior to help them commit the robbery. He told the jury that he drove by Urell's home with Fauber, Buckley, and Jarvis to scout it out. He testified that Fauber and Buckley spoke about committing the burglary. And he confirmed that Fauber had a sawed-off shotgun that night. Each of these details aligned with Buckley's testimony and Fauber's admissions after waiving his *Miranda* rights.

Rowan then corroborated what happened after the murder. He testified that Fauber and Buckley returned to the apartment at 1:00 a.m. and that he helped Fauber unload the safe from Urell's El Camino and move it into the storage area beneath the apartment. He recounted that Fauber managed to open part of the safe. And he noted that Fauber and Buckley disposed of the safe because Rowan did not want it in his storeroom. Rowan also testified that he told Fauber and Buckley to "get rid of [Urell's] El Camino," that Fauber and Buckley drove off with the vehicle, and that he did not see it again. Rowan's testimony matched Buckley's in each respect.

Perhaps most importantly, Rowan testified that Fauber murdered Urell and how he did it. Rowan testified that Fauber told him that Urell was home during the robbery. Then, when Rowan asked Fauber if he had hurt Urell, Fauber admitted that "he thought he'd killed him." Fauber said that

he had "hit him" and that Urell "was having a hard time" breathing. Fauber also told Rowan why he killed Urell: Urell saw his face, and Fauber "wasn't ready to leave Ventura yet." This matched Buckley's testimony that Fauber had killed Urell to prevent him from being a witness to the crime. And the autopsy also corroborated Rowan's testimony—showing that Urell was struck repeatedly with an object consistent with the blunt side of an ax, and that he died of asphyxiation or suffocation. Underscoring Rowan's importance at trial, the prosecutor's discussion of Rowan's testimony was among the last topics the jury heard before deliberating.

Other evidence also corroborates Buckley's testimony about the circumstances surrounding the crime. Fauber himself confirmed what happened before the murder when he waived his *Miranda* rights and admitted that Jarvis told him about Urell and that he scouted Urell's house with Jarvis, Rowan, and Buckley. And physical evidence connected Fauber to Urell, namely, Hal Simmon using Urell's telephone card number (Simmon said that Fauber gave it to him), Fauber having part of the calling card in his wallet, and Urell's road atlas being found in a camper that Fauber used.

\*   \*   \*

In sum, the California Supreme Court could reasonably conclude that even if Fauber's counsel acted deficiently in failing to object to the prosecution's use of Buckley's plea agreement, there was no prejudice under *Strickland*. Fairminded jurists could determine that Fauber's counsel performing differently would not create a "substantial likelihood of a different result" than the one the jury reached. *Kayer*, 141 S. Ct. at 524 (quoting *Cullen*, 563 U.S. at 189).

C

We turn next to Claims 10(a) and 10(c), which share a factual nexus with Fauber's ineffective assistance allegations. Here Fauber argues that the prosecutor vouching for Buckley's credibility through his plea agreement, and the state trial court's allowance of the same, violated Fauber's due process rights under the Fourteenth Amendment. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Fauber's argument fails for two reasons: this claim is procedurally defaulted and Fauber cannot show prejudice even if the claim were preserved.

*First*, Fauber's claim is procedurally defaulted. We lack jurisdiction "when (1) a state court has declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quotations and alterations omitted). To qualify as independent, a state procedural rule must not "rest primarily on federal law, or . . . be interwoven with the federal law." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991). "State rules count as adequate if they are firmly established and regularly followed." *Johnson v. Lee*, 578 U.S. 605, 606 (2016) (per curiam) (quotations omitted).

Here, the California Supreme Court held that Fauber procedurally defaulted his due process vouching claim by failing to object to the prosecutor reading Buckley's plea agreement to the jury. *Fauber*, 831 P.2d at 264. This holding rested on California's contemporaneous objection

rule.  Under California law, a party must make a proper and timely objection at trial to preserve the argument on appeal. *See* Cal. Evid. Code. § 353; *People v. Ramos*, 15 Cal.4th 1133, 1171 (1997).

We have repeatedly recognized California's contemporaneous objection rule as "an adequate and independent state law ground" that forecloses our review. *See, e.g.*, *Zapien v. Davis*, 849 F.3d 787, 794 n.2 (9th Cir. 2015); *Fairbank v. Ayers*, 650 F.3d 1243, 1256 (9th Cir. 2011); *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092–93 (9th Cir. 2004).  That remains the case even though the California Supreme Court also went on to address Fauber's claim on the merits.  *See, e.g.*, *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

For the first time in his reply brief, Fauber argues that we should not find his due process vouching claim procedurally barred because he has shown cause and prejudice to excuse the default.  While we could find this argument forfeited because Fauber did not raise it in his opening brief, *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992), the argument fails regardless.

We may review a state court decision that rests on an adequate and independent state ground when a party has shown cause for the forfeiture and prejudice flowing from it. *Walker*, 562 U.S. at 316.  To show cause, a petitioner must point to "some objective factor external to the defense [that] impeded his adherence to the procedural rule." *United States v. Skurdal*, 341 F.3d 921, 925 (9th Cir. 2003) (quotations omitted).  "An attorney error does not qualify as 'cause' to excuse a procedural default unless the error amounted to constitutionally ineffective assistance of counsel." *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017).  Prejudice to excuse the

default "requires the petitioner to establish not merely that the errors at trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Bradford v. Davis*, 923 F.3d 599, 613 (9th Cir. 2019) (quotations and alterations omitted).

Fauber cannot meet the "cause and prejudice" standard. To excuse his procedural default, Fauber points only to counsel's alleged ineffective assistance in failing to object to the prosecution's use of Buckley's plea agreement. But we have already explained that counsel's allegedly deficient performance did not rise to the level of a Sixth Amendment violation because Fauber cannot show prejudice. Given the State's extensive evidence showing that Fauber killed Urell, Fauber cannot demonstrate that the result of his trial would have been different had his counsel objected and successfully prevented the prosecution from relying upon Buckley's plea agreement. *United States v. Ratigan*, 351 F.3d 957, 965 (9th Cir. 2003) (holding that "[i]n order to excuse his procedural default, [petitioner] must show that counsel's performance was deficient and that the deficient performance prejudiced the defense") (quotations omitted).

*Second*, even if Fauber's due process claims were not procedurally defaulted, they would fail on the merits because, once again, the alleged vouching was harmless. The parties spar at length over whether, assuming we could get past the procedural default, AEDPA should apply to the California Supreme Court's alternative holding that Fauber's vouching claim failed for lack of prejudice, given the California Supreme Court's reliance on a state law harmlessness standard. We need not resolve this disagreement. Even without AEDPA, under the standard in

*Brecht v. Abrahamson*, 507 U.S. 619 (1993), Fauber cannot prevail.

Under *Brecht*, "habeas relief is only available if the constitutional error had a 'substantial and injurious effect or influence' on the jury verdict or trial court decision." *Jones v. Harrington*, 829 F.3d 1128, 1141 (9th Cir. 2016) (quoting *Brecht*, 507 U.S. at 623); *see also Davis v. Ayala*, 576 U.S. 257, 268 (2015). "If so, or if one is left in grave doubt, the conviction cannot stand." *Gill v. Ayers*, 342 F.3d 911, 921 (9th Cir. 2003) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). Here, for the same reasons that we rejected Fauber's ineffective assistance claim, the prosecution's reliance on Buckley' plea agreement did not exert a substantial and injurious effect on the jury. Therefore, Fauber's due process claims would fail even setting aside the unexcused procedural default.

IV

In Claim 28(c), Fauber argues that the state trial court improperly excluded his unaccepted plea offer as mitigating evidence at the penalty phase. We conclude that Fauber is not entitled to relief. No clearly established federal constitutional law holds that an unaccepted plea offer qualifies as evidence in mitigation that must be admitted in a capital penalty proceeding. Regardless, Fauber cannot show prejudice: given the extreme aggravating factors that the State put forward coupled with Fauber's already extensive but unsuccessful presentation of mitigating evidence, there is no basis to conclude that the jury would have reached a different result if it had considered Fauber's unaccepted plea.

## A

We again begin with the relevant facts and rulings. At the penalty phase, Fauber wanted to present evidence that the prosecution had initially offered him a plea that would have allowed him to avoid the death penalty in exchange for testifying against Buckley and Caldwell, and that Fauber refused the offer. Fauber's counsel explained that he wanted to present Fauber's rejection of the plea deal as character evidence that demonstrated Fauber's loyalty to his friends. He also wanted to present the plea agreement itself as evidence that the district attorney "felt that [Fauber] was an appropriate [person] for life imprisonment rather than the gas chamber." The prosecutor moved to exclude any reference to the unaccepted plea.

The trial court found the evidence inadmissible under California Evidence Code § 352. Regarding the plea offer itself, the court concluded that it was "totally irrelevant" because it "does not relate to the defendant's character, prior record or circumstance of the offense." The court noted that such an agreement is "just the district attorney's position at one time for reasons known to the district attorney. It has no bearing on the defendant whatsoever." The trial court also excluded Fauber's rejection of the plea offer. Fauber rejecting the offer had "very low relevancy" and "very low probative value" as mitigating evidence of loyalty. Instead, the plea agreement threatened to confuse the jury and unduly prolong the trial.

At closing argument, the prosecution maintained that Fauber deserved the death penalty. The prosecution argued to the jury that "the only appropriate penalty in this case is the death penalty," stating, for example: "The defendant has demonstrated vividly that he is a man who, if given the opportunity, will kill again, maybe a prison guard, maybe an

inmate, maybe somebody that makes friends with him, somebody that annoys him."

On direct appeal, the California Supreme Court rejected Fauber's claim that the trial court erred in excluding from the penalty phase evidence about Fauber's unaccepted plea offer. *Fauber*, 831 P.2d at 288. The Court recognized that "a capital defendant must be allowed to present all relevant mitigating evidence to the jury." *Id.* (citing *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986), and *Lockett v. Ohio*, 438 U.S. 586 (1978)). But at the same time, "the trial court determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury." *Id.* (citing Cal. Evid. Code § 352). In this case, the California Supreme Court held, the trial court did not err in treating Fauber's refusal of a plea offer as inadmissible. *Id.*

The Court agreed with the trial court that Fauber's plea agreement provided no insight into his character and was "meaningless." *Id.* at 288. "Standing alone," the Court concluded, "[t]he fact that the offer was made, like the fact that it was refused," "sheds no light on [Fauber's] character and would likely mislead rather than assist the jury in its determination." *Id.* In particular, "such an offer may reflect leniency rather than a belief that the defendant is less culpable for the crime charged." *Id.*

Considering Fauber's rejection of the plea offer, the California Supreme Court further noted that "[t]o supply meaning to the bare fact of the refusal, additional inquiry regarding the underlying reasons would have been required." *Id.* But "[s]uch examination, as the trial court concluded, had the potential to mislead and confuse the jury." *Id.*

Justice Mosk wrote a separate concurrence on this issue. *Id.* at 296–97 (Mosk, J., concurring).  He concluded that the trial court may have erred in excluding evidence of plea bargaining but that the evidence "would have added little, if anything, of marginal value.  Therefore, any error could not have affected the outcome within any reasonable possibility, and must be held harmless beyond a reasonable doubt."  *Id.* at 297.

B

Before us, Fauber renews his argument that the state court erred in excluding as supposed mitigating evidence the State's life-sentence plea offer and Fauber's rejection of it. On appeal, however, Fauber has adjusted his argument somewhat, maintaining that he was entitled to introduce this evidence in mitigation as a matter of due process to rebut the State's argument that he presented a future danger.  The State argues that Fauber forfeited this argument by failing to raise it either before the state court or the district court.

It is certainly true that Fauber's theory at the very least reflects some degree of refinement from the argument he presented previously.  In state court and before the district court, Fauber largely argued that the unaccepted plea was mitigating because it reflected positively on his character by showing his loyalty to his friends.  Fauber maintained that the plea offer was "a matter in mitigation bearing upon the circumstances of the offense and the character of the Defendant herein."  The state trial court and California Supreme Court appear to have reasonably understood Fauber's argument in those terms.

Before the state trial court, however, Fauber's counsel also stated that the plea offer was relevant because it reflected "the district attorney's attitude toward [Fauber] and

the offenses at some point prior to trial." And Fauber stated in his state court briefs that the plea offer showed the district attorney "felt that [Fauber] was an appropriate [person] for life imprisonment rather than the gas chamber," because "a prior offer of a life sentence . . . suggests that in the opinion of the prosecutor, the defendant's character is such that he should not be put to death." At least to this extent, Fauber preserved the argument he raises now. We thus turn to the merits of this claim.

C

1

In a series of decisions beginning with *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978) (plurality op.), *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), and *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986), the Supreme Court established that in the capital sentencing context, and under the Eighth and Fourteenth Amendments, "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). In this line of cases, the Supreme Court held that capital sentencers may "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings*, 455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 604–05); *see also McCleskey v. Kemp*, 481 U.S. 279, 306 (1987). In addition, "[w]here the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty," the "relevance of evidence of probable future conduct in prison as a factor in aggravation or mitigation of an offense is underscored." *Skipper*, 476 U.S. at 5 n.1.

The Supreme Court has also made clear, however, that these constitutional requirements do not render states incapable of placing any limits on what might qualify as mitigating evidence.  *Lockett* affirmed that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." 438 U.S. at 604 n.12.  Thus, state courts in penalty phase proceedings "'retain the traditional authority to decide that certain types of evidence may have insufficient probative value to justify their admission,'" and "they may enact reasonable rules governing whether specific pieces of evidence are admissible." *United States v. Tsarnaev*, 142 S. Ct. 1024, 1038 (2022) (quoting *Skipper*, 476 U.S. at 11 (Powell, J., concurring in the judgment)).  The Supreme Court has thus "expressly held that 'the Eighth Amendment does not deprive' a sovereign 'of its authority to set reasonable limits upon the evidence a capital defendant can submit, and control the manner in which it is submitted." *Id.* (quoting *Oregon v. Guzek*, 546 U.S. 517, 526 (2006)) (alterations omitted); *see also Stenson v. Lambert*, 504 F.3d 873, 891 (9th Cir. 2007) (holding under AEDPA that state court was not objectively unreasonable in excluding claimed mitigating evidence).

Fauber relies heavily on two of our cases, *Summerlin v. Schriro*, 427 F.3d 623, 640 (9th Cir. 2005) (en banc), and *Scott v. Schriro*, 567 F.3d 573, 584 (9th Cir. 2009) (per curiam), to argue that his unaccepted plea offer should qualify as mitigating evidence.  In *Summerlin*, we held that capital defense counsel provided constitutionally deficient assistance of counsel by "utterly fail[ing] in his duty to investigate and develop potential mitigating evidence for presentation at the penalty phase."  427 F.3d at 631.  In explaining why counsel's deficient performance caused

prejudice, we noted (among other things) that the prosecutor had initially offered the defendant a plea agreement that would have spared his life, but the offer was later withdrawn. *Id.* 640–41. We regarded the unentered plea agreement as supportive of *Strickland* prejudice because it showed that "this was not by any means a clear-cut death penalty case." *Id.* at 640.

*Summerlin* did not address whether the unaccepted plea offer was itself mitigating evidence that the sentencer was required to consider. But *Scott* did address it, although in a somewhat truncated fashion. In *Scott*, we held that the state court had relied on an inadequate procedural bar in denying a capital defendant's request for post-conviction relief. 567 F.3d at 576–77. In detailing the evidentiary proceedings that should take place on remand on the defendant's claim that his counsel provided ineffective assistance at the penalty phase, we specified areas of mitigating evidence that the court should evaluate. *Id.* 583–85. Relevant here, we noted that the prosecution had made a plea offer to the defendant, but that defense counsel had rejected it over the defendant's objection. *Id.* at 584. Citing *Summerlin*, we stated that "evidence of the plea offer could have been introduced during the sentencing phase as mitigation." *Id.* That was because "[t]he plea offer's mitigatory effect is clear: the prosecution thought this was not a clear-cut death penalty case." *Id.* (citing *Summerlin*, 427 F.3d at 631).[2]

---

[2] In a parenthetical, *Scott* described *Summerlin* as "holding that evidence the prosecution offered to allow the defendant to plead guilty to second-degree murder and aggravated assault was mitigating evidence that could be admitted in the sentencing phase after the defendant had been found guilty of first-degree murder." *Scott*, 567 F.3d at 584 (citing *Summerlin*, 427 F.3d at 640). While *Scott* would bind us in an appropriate case, its description of *Summerlin* was not accurate.

Although supportive of *Fauber* in some sense, these cases do not govern here. *Summerlin* did not decide the same issue we now consider, 427 F.3d at 640–41, and neither case decided the issue under AEDPA's standard of review, *see Scott*, 567 F.3d at 584, 586 (no state court decision on the merits); *Summerlin*, 427 F.3d at 628–29 (habeas petition filed pre-AEDPA). Regardless of how close *Scott* or *Summerlin* might be to this case, the question before us is whether the California Supreme Court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*." 28 U.S.C. § 2254(d)(1) (emphasis added).

And on this point, the Supreme Court has been clear: "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam); *see also, e.g.*, *Lopez v. Smith*, 574 U.S. 1, 4 (2014) (per curiam) ("We have emphasized, time and again, that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'"); *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam) (holding that under AEDPA, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced").

When we consider the only precedent that matters here—Supreme Court precedent—we cannot conclude that the state court's denial of relief was objectively unreasonable.

The reason is straightforward: the Supreme Court has never held that an unaccepted plea offer qualifies as constitutionally relevant mitigating evidence, whether to rebut future dangerousness or for any other allegedly mitigating reason.  *See Hitchcock v. Sec'y, Florida Dep't of Corr.*, 745 F.3d 476, 482 (11th Cir. 2014) ("The Supreme Court has never held that a prosecutor's offer to take the death penalty off the table in return for a guilty plea is a mitigating circumstance.").  Fauber relies on the general principle that states "cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the death penalty."  *McCleskey*, 481 U.S. at 306.  But for AEDPA purposes, that general principle is too general.  And Fauber has not shown that the California Supreme Court unreasonably applied it.

The Supreme Court has repeatedly reminded lower courts applying AEDPA not to "fram[e] [Supreme Court] precedents at a high level of generality."  *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022); *Woods v. Donald*, 575 U.S. 312, 318 (2015).  Were the rule otherwise, lower courts "could transform even the most imaginative extension of existing case law into clearly established federal law," "collapsing the distinction between 'an unreasonable application of federal law' and what a lower court believes to be 'an *incorrect* or *erroneous* application of federal law."  *Jackson*, 569 U.S. at 512 (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).  Such an approach "would defeat the substantial deference that AEDPA requires."  *Id.*

Here, nothing in Supreme Court precedent establishes that an unaccepted plea offer reflects an "aspect of a defendant's character or record [or] any of the circumstances of the offense," such that a state court must treat it as

constitutionally relevant mitigating evidence.  *Eddings*, 455 U.S. at 110.  Even if the rule of *Lockett* could be extended in that manner, nothing in Supreme Court precedent mandated that extension.  *See White v. Woodall*, 572 U.S. 415, 426 (2014) (holding that AEDPA "does not require state courts to *extend* [Supreme Court] precedent or license federal courts to treat the failure to do so as error").

It would therefore not be objectively unreasonable for a state court to instead conclude that an unaccepted plea offer differs from the types of mitigating evidence classically treated as constitutionally relevant, such as cognitive limitations, *see e.g.*, *Smith v. Texas*, 543 U.S. 37, 44 (2004), an abusive upbringing, *see, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 525, 528 (2003); *Eddings*, 455 U.S. at 115; the circumstances of the offense, *see, e.g.*, *Parker v. Dugger*, 498 U.S. 308, 314 (1991); or positive character traits, *see, e.g.*, *Wong v. Belmontes*, 558 U.S. 15, 21 (2009) (per curiam).  That is, given the various reasons that plea offers are made (and rejected), they could be regarded as not meaningfully tied to the defendant's "personal responsibility and moral guilt," *Enmund v. Florida*, 458 U.S. 782, 801 (1982), or "directly related to the personal culpability of the criminal defendant," *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).  A state court could thus conclude that introducing this evidence at the penalty phase is not consonant with the constitutional objectives of the penalty phase determination itself.

For these reasons, we respectfully disagree with our fine dissenting colleague that the alleged constitutional violation here is clearly established under AEDPA.  The dissent asserts that because the Supreme Court has "adopted a broad rule" "requiring the admission of *any* relevant mitigating

evidence," it follows that the California Supreme Court's decision allowing the exclusion of the plea offer was contrary to clearly established federal law. But under AEDPA, when the Supreme Court sets forth rules that are "more general, . . . their meaning must emerge in application over the course of time." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

That is the case here. The Supreme Court has not categorized an unaccepted plea offer as constitutionally relevant mitigating evidence. *Skipper*, on which the dissent principally relies, did not address that issue. And consistent with the states' traditional authority to place limits on the admission of evidence that is insufficiently probative in mitigation, *Tsarnaev*, 142 S. Ct. at 1038; *Lockett*, 438 U.S. at 604 n.12, the California Supreme Court could reasonably regard an unaccepted plea as qualitatively different from other forms of evidence that have been regarded as constitutionally mitigating. The dissent's contrary position would violate AEDPA's precepts.

## 2

Further confirmation of this is found in the many cases that have held—contrary to our decision in *Scott*—that unaccepted plea offers do *not* qualify as mitigating evidence. As the Eleventh Circuit has recognized, "[e]vidence of a rejected plea offer for a lesser sentence . . . is not a mitigating circumstance because it sheds no light on a defendant's character, background, or the circumstances of his crime." *Hitchcock*, 745 F.3d at 483. Indeed, it appears that every other court besides our own has reached this conclusion. *See Wright v. Bell*, 619 F.3d 586, 600 (6th Cir. 2010); *Owens v. Guida*, 549 F.3d 399, 422 (6th Cir. 2008); *Bennett v. State*, 933 So. 2d 930, 953 (Miss. 2006); *Howard v. State*, 238 S.W.3d 24, 47 (Ark. 2006); *Neal v. Commonwealth*,

95 S.W.3d 843, 852–53 (Ky. 2003); *Wisehart v. State*, 693 N.E.2d 23, 64 (Ind. 1998); *Wiggins v. State*, 597 A.2d 1359, 1370 (Md. 1991), *reversed on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003); *Ross v. State*, 717 P.2d 117, 122 (Okla. Crim. App. 1986).

We do not cite these out-of-circuit lower court cases as reflective of clearly established law under § 2254(d)(1), but rather as demonstrating that fairminded jurists could reach the same conclusion that these many courts have. "[I]n the face of authority that is directly contrary" to our case law, "and in the absence of explicit direction from the Supreme Court," we "cannot hold" that the California Supreme Court's decision violates clearly established federal law. *Boyd v. Newland*, 467 F.3d 1139, 1152 (9th Cir. 2006) (amended op.); *see also Kessee v. Mendoza-Powers*, 574 F.3d 675, 679 (9th Cir. 2009) ("Because the Supreme Court has not given explicit direction and because the state court's interpretation is consistent with many other courts' interpretations, we cannot hold that the state court's interpretation was contrary to, or involved an unreasonable application of, Supreme Court precedent.").

Instead, cases like the Eleventh Circuit's decision in *Hitchcock* show how reasonable jurists could conclude that an unaccepted plea agreement is not constitutionally relevant mitigating evidence. *Hitchcock* held that a capital defendant's non-acceptance of a plea is "devoid of any moral significance" from a capital punishment perspective because Eighth Amendment mitigation is not "a matter of a particular prosecutor's willingness to bargain." 745 F.3d at 482. In particular, the Eleventh Circuit concluded:

> Such a plea offer does not by itself show that the prosecutor believed the defendant did not deserve the death penalty. A plea offer of a

> non-capital sentence in a capital case may
> simply reflect a desire to conserve
> prosecutorial resources, to spare the victim's
> family from a lengthy and emotionally
> draining trial, to spare them the possibility of
> protracted appeal and post-conviction
> proceedings (spanning in this case more than
> three decades), or to avoid any possibility,
> however slight, of an acquittal at trial.[3]

*Id.* at 483. And although it did not decide the question of constitutional relevance on this basis, the Eleventh Circuit pointed out that "requiring the admission of rejected plea offers as mitigating evidence in capital cases could have the pernicious effect of discouraging prosecutors from extending plea offers in the first place." *Id.* at 484 & n.2 (citing *Wright*, 619 F.3d at 600).

Other cases rejecting Fauber's argument have employed similar reasoning as *Hitchcock*. *See, e.g.*, *Wright*, 619 F.3d at 599–601; *Owens*, 549 F.3d at 419–22; *Neal*, 95 S.W.3d at 852–53. And applying AEDPA, the Sixth Circuit in *Wright* rejected Fauber's same argument in response to the defendant's contention that due process allowed him to utilize the unaccepted plea to rebut the prosecution's argument of future dangerousness. *See* 619 F.3d at 599–600 ("Although our opinion in *Owens* did not address the specific rebuttal argument that Wright has made before this court—that Wright should be allowed to present evidence of the alleged plea offer to rebut statements by the State at closing argument suggesting that Wright might pose a

---

[3] Indeed, as the dissent notes, the prosecutor told the trial court that it made the initial plea offer to Fauber because it "did not have enough evidence to convict Buckley and Rowan."

danger to other inmates if he received a life sentence rather than the death penalty—[*Owens*'s] determination that plea negotiations are not relevant evidence of mitigating circumstances is still relevant here."). As the Sixth Circuit explained, "nothing in the alleged plea offer constitutes relevant evidence that Wright would not pose a danger if given a life sentence." *Id.* at 601. That is because "[t]he existence of a plea offer might indicate only that the state believed its important interests in judicial efficiency and finality of judgments were sufficient to outweigh any potential risk associated with a life sentence, not that those risks did not exist." *Id.*

In sum, other than our decision in *Scott*, the cases that have addressed Fauber's argument side with the California Supreme Court's result and reasoning here. Although *Scott* took a different approach, we do not think the California Supreme Court was objectively unreasonable in resolving Fauber's claim like the majority of courts to have addressed the question. *See Hitchcock*, 745 F.3d at 483 ("We agree with the seven courts (we make it eight) on the majority side of this issue and not with the Ninth Circuit."). Under AEDPA—and until the Supreme Court speaks more specifically on this issue—we cannot say these many other courts were so obviously mistaken. For these same reasons, the dissent's attempt to discern clearly established law in Fauber's favor in the face of so much contrary precedent does not withstand scrutiny.

### 3

Finally, we note that the California Supreme Court offered a related rationale for holding that the trial court was not required to allow in evidence of Fauber's unaccepted plea: it would require ancillary evidentiary proceedings into "the underlying reasons" for the plea offer and its rejection,

which "had the potential to mislead and confuse the jury." *Fauber*, 831 P.2d at 288. On the facts of this case, that reasoning reflected a valid concern, and certainly was not contrary to or an unreasonable application of clearly established Supreme Court precedent. Indeed, the Supreme Court has recognized that even under *Lockett* and its progeny, evidence can be excluded based on state courts' "evenhanded application" of their evidentiary rules, *Skipper*, 476 U.S. at 6, which could include, in appropriate cases, the usual rules associated with balancing undue prejudice, jury confusion, and consumption of time against possible probative value, *see Fauber*, 831 P.2d at 287–88 (citing Cal. Evid. Code § 352).

These considerations were relevant here. When Fauber sought to have the unaccepted plea introduced, the prosecution asked for "a hearing with witnesses to actually establish the foundational basis" for the submission. The prosecutor explained that he had gone back through his files and located a letter showing that it was Fauber and his counsel who initially proposed a plea arrangement, but that Fauber then "got cold feet"—not because of loyalty towards his friends but "because he didn't want to plead to something that was going to put him in prison for the rest of his life."

The prosecutor further argued that if the trial court were considering allowing the plea offer into evidence, the prosecution would want to show that the offer was based on the State's knowledge of the facts when the offer was made, but that the record had "changed dramatically" since that time (with the implication that a plea offer was no longer appropriate). To explore these various issues, the State believed that the prosecutor, defense counsel, and Fauber may all need to testify. It is not apparent Fauber was willing

to do so, which would have likely opened the door to potentially damaging cross-examination.[4]

In whichever way the proceedings would have unfolded in the trial court, it is apparent that introducing Fauber's unaccepted plea and his rejection of it was no straightforward evidentiary matter.  That only contributes to our conclusion that the state court's rejection of Fauber's *Lockett* argument—a ruling that was broadly consistent with almost all case law on this issue—was not objectively unreasonable.

D

Even if the trial court's exclusion of the plea offer violated clearly established federal law, there is no basis to conclude that the result of the penalty phase would have been any different had the jury learned of the plea offer and Fauber's rejection of it.  The California Supreme Court did not rule on this basis, and Fauber thus argues that AEDPA does not apply.  The State does not respond on this point, and so we will evaluate this issue without AEDPA's deferential posture.  The standard of review is ultimately immaterial, however, because the exclusion of the plea offer did not have a "substantial and injurious effect or influence" on the jury's decision.  *Brecht*, 507 U.S. at 637.

---

[4] The dissent errs in claiming we have "vastly overstate[d] the complications that might have arisen from admitting the plea offer evidence in this case."  Setting aside the fact that Fauber hardly presented his arguments to the state court in the nuanced way that the dissent now does, there is no basis for the dissent's assumption that the only evidence relevant to the State's initial plea offer would come from the prosecutor.  Indeed, as we have noted, the prosecutor explained that it was Fauber and his attorney who had originally proposed the plea deal.

We will assume for purposes of our analysis here that Fauber could have used the unaccepted plea agreement to the maximum mitigating effect he claims. For reasons we have already discussed, it is doubtful this assumption is warranted: the prosecution was evidently poised to provide testimony about the circumstances surrounding Fauber's rejection of the plea agreement and how circumstances had changed since the State first discussed a plea offer with him. It seems entirely possible that introduction of the plea agreement could have been unhelpful to Fauber, or at the very least a mixed bag. But again, we will assume otherwise.

An error is harmless in this context when "there is overwhelming evidence of aggravating circumstances and [the] proffered mitigation evidence is limited or relatively minor." *Djerf v. Ryan*, 931 F.3d 870, 886 (9th Cir. 2019) (quotations omitted). Similarly, exclusion of evidence can be harmless when, in light of the mitigating evidence that was presented, the excluded evidence "would not have affected the balance of mitigating against aggravating circumstances." *Runningeagle v. Ryan*, 825 F.3d 970, 985 (9th Cir. 2016). All of this is true here.

As an initial matter, the State presented highly compelling aggravating circumstances. First and foremost, the jury had already heard overwhelming evidence of Fauber's depraved ax-murder killing of Urell, a man he had never met before. Fauber murdered Urell only to avoid being implicated in the burglary of Urell's home. And Fauber went through with the murder despite the victim being tied up and defenseless. Even after striking Urell multiple times and reducing his breathing to labored hissing and later silence, Fauber returned to Urell's room and struck him with the ax again. The highly disturbing autopsy results—which demonstrated that Fauber had broken Urell's

neck and ruptured tough neck ligaments with the blunt side of an ax—underscored the barbarity of the crime and the decidedness of Fauber's actions. The dissent's effort to minimize Fauber's crime as "not especially cruel or heinous" is thus unfounded. Indeed, the circumstances of Fauber's murder of Urell was "[t]he very first factor" in aggravation that the prosecution asked the jury to consider.

At the penalty phase, the State also demonstrated that Fauber had murdered two other people less than three months before killing Urell. Evidence that a capital defendant "had committed another murder" is "the most powerful imaginable aggravating evidence." *Wong*, 558 U.S. at 28 (quotations omitted). And, in this case, the State demonstrated that Fauber murdered not only multiple times but for varied reasons. The Urell murder showed Fauber's capacity for homicide during a violent felony. The circumstances surrounding Fauber's murders of David Church and Jack Dowdy, Jr., meanwhile, confirmed Fauber's propensity for nearly spontaneous acts of extreme violence (Church) as well as targeted, vendetta-style killing (Dowdy).

In the Church murder, Fauber participated in the slaying of an acquaintance merely to prevent the partygoer from reporting Fauber's drug use to the police. As with Urell, Fauber hit Church with an ax handle, commenting to Buckley that Church "was a hard guy to kill."

The Dowdy murder was uniquely alarming for its own reasons, given the series of violent events surrounding Dowdy's death. The victim was one of Fauber's longtime friends. *Fauber*, 831 P.2d at 276. Yet, Fauber repeatedly terrorized his wife and her family because he was romantically interested in her. *Id.* At different points, Fauber pulled a gun on Dowdy, held Kim at gunpoint

because she had hugged a friend, and threatened to "knock her off." *Id* at 276–79. One night, Kim woke up and found that Fauber had broken in and was attempting to strangle her. *Id.* Fauber admitted to multiple witnesses—Buckley, Kim's uncle, and Kim herself—that he killed Jack, whom he believed was preventing him from having a relationship with Kim. *Id.* at 279. After the murder, Fauber's violent conduct continued. He appeared at Kim's grandmother's home and ordered Kim to come with him at knifepoint or he would kill everyone in the house. *Id.* When later confronted by Kim's family, Fauber expressed no remorse. *Id.*[5]

Fauber's plea agreement and his rejection of it paled in comparison to the extensive aggravating evidence of Fauber's three murders and other violent actions.[6] But the unaccepted plea would have also added little to the robust case of mitigation that defense counsel put on. *Cf. Fauber*, 831 P.2d at 297 (Mosk, J., concurring) (explaining that the plea agreement "would have had added little, if anything, of marginal value"). In a substantially comprehensive

---

[5] The dissent attempts to minimize the aggravating evidence of Fauber killing Dowdy and Church on the theory that this evidence was relevant "primarily because [it] bore on Fauber's future dangerousness," and that if Fauber's unaccepted plea agreement had been introduced, the prosecution "might have decided to avoid making a future dangerousness argument altogether." But there is no basis for the dissent's speculation on this point. And regardless, the evidence of Fauber killing Dowdy and Church was highly relevant to Fauber's reprehensibility, in addition to his future dangerousness.

[6] Fauber argues that the jury struggled to reach a decision at the penalty phase because it submitted a note during deliberations that stated: "If the jury is hung as to the decision, does the life without possibility of parole prevail or does the penalty phase go over again?" But the reason and context for this note is unclear and it cannot overcome the clear import of the record evidence we have discussed above.

mitigation portrait, Fauber's counsel presented evidence of Fauber's troubled childhood, positive qualities, and possible mental instability. Several of Fauber's siblings and friends testified about his unfortunate upbringing, including his dysfunctional family life and the decrepit conditions of his childhood home. They told the jury that Fauber was the youngest of eleven children, only seven of whom survived to adulthood. Fauber's father was an unemployed alcoholic who was verbally abusive and disciplined the children with razor straps, belts, and buckles. Fauber did not finish high school. As a teenager, he was involved in a motorcycle accident that killed one of his brothers.

Counsel also presented two experts who testified about Fauber's background. Dr. Isabel Wright, Ph.D., conducted an eight-month investigation into Fauber's life. She testified based on her travels to Fauber's hometown and her interviews of his neighbors, the school nurse, a Sunday school teacher, a high school vice principal, a special education worker, two counselors, truant and welfare officers, and Fauber's friends, family, and acquaintances. Dr. Edward Grover, a psychologist, examined and ran tests on Fauber. Dr. Grover told the jury that Fauber had average intelligence and a possible organic brain deficit. Dr. Grover also informed the jury that Fauber "had impaired interpersonal skills and some difficulty keeping reality and fantasy separated." Fauber's friends testified that he was a good and caring person.

Although Fauber's mitigation presentation did not convince the jury, it was not without force. And the mitigating evidence that defense counsel did put on was far more powerful and probative of Fauber's character and culpability than the plea deal. We do not mean to suggest, as the dissent claims, that Fauber's mitigating evidence was

"persuasive." Given Fauber's penchant for ax-murder and violent assault, the aggravating factors here substantially outweighed the mitigating evidence that Fauber put forward. Instead, our point is that Fauber's mitigation presentation confirms that he put forward witnesses and experts who could shed light on his character and culpability in a way that the State's plea offer could not. Therefore, there is no reason to believe, as the dissent maintains, that evidence of the plea offer was "likely to tip the scales in favor of a life sentence."

In short, we conclude that any error in the refusal to admit the plea offer was harmless. *See Scott (Roger) v. Ryan*, 686 F.3d 1130, 1135 (9th Cir. 2012) (holding that "[e]ven considering the totality of mitigation evidence that Scott introduced at the district court on remand," including "evidence that the State once offered him a plea bargain," "we cannot say it would have made any difference in the outcome").

\* \* \*

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**

WATFORD, Circuit Judge, dissenting in part:

Before Curtis Fauber was tried for capital murder, the Ventura County District Attorney's office offered him a plea deal under which Fauber would be sentenced to life in prison without the possibility of parole, provided that he testified against co-conspirators Brian Buckley and Chris Caldwell. Fauber turned the offer down, went to trial, and was convicted. At the penalty phase of his trial, Fauber sought to introduce evidence of the plea offer to show that the

District Attorney's office did not believe the death penalty was required in his case.  The trial court excluded the evidence on the ground that it had minimal relevance and posed a substantial risk of misleading the jury and prolonging the trial.  During the penalty phase, the prosecutor argued that Fauber must be executed because he was likely to kill again if sentenced to life in prison.  Due to the trial court's ruling, Fauber could not rebut this claim by pointing to the District Attorney's prior offer of a plea deal with a life sentence.  This exclusion of relevant mitigating evidence violated clearly established federal law, and the error was not harmless.  I would therefore grant Fauber's habeas petition as to the exclusion of the plea offer at the penalty phase.[1]

## I

Before the start of the penalty phase, the prosecutor filed a motion in limine seeking to exclude any evidence related to the plea offer.  In response, Fauber argued that the offer was relevant mitigating evidence that must be admitted under *Lockett v. Ohio*, 438 U.S. 586 (1978).  He asserted two distinct theories of relevance: (1) the plea offer reflected the District Attorney's assessment of Fauber's character and the circumstances of his offense; and (2) Fauber's rejection of the plea offer showed the positive character trait of loyalty to his friends.

The state trial court dismissed the first theory out of hand, declaring that the offer itself was "totally irrelevant."

---

[1] I agree with the majority that Fauber is not entitled to relief on his ineffective assistance and due process vouching claims.  Accordingly, I would not grant Fauber's habeas petition with respect to the guilt phase of his trial.

The court gave greater consideration to the second theory but ultimately ruled that Fauber's rejection of the plea offer was inadmissible under California Evidence Code § 352, which permits the exclusion of evidence when its probative value is substantially outweighed by the risk of delay, unfair prejudice, confusing the issues, or misleading the jury. In the court's view, this evidence could be admitted only if Fauber testified about his reasons for rejecting the offer, which would permit the prosecutor to explain his decision to make the offer in the first place. The court concluded that a mini-trial on the significance of Fauber's rejection of the plea offer risked confusing the issue and misleading the jury.

In both the California Supreme Court and his federal habeas petition, Fauber continued to press both theories of relevance. This appeal, however, involves only the first theory: that the prosecutor's offer of a plea deal for life in prison reflected an assessment of Fauber's character and the circumstances of his offense. As the majority recognizes, Fauber has refined his claim in presenting it to this court. He contends that the plea offer is specifically relevant to rebut the prosecutor's claim that Fauber would pose a danger to others if spared the death penalty. He is not arguing that plea offers are categorically admissible under *Lockett*. Rather, his contention is a more limited one—namely, that when a prosecutor explicitly urges the jury to impose a death sentence on the ground that the defendant will kill again if sentenced to life in prison, *Lockett* and its progeny clearly establish that plea offer evidence must be admitted to refute that claim. Although this argument is more precise than the one Fauber made in state court and before the federal district court, I agree with the majority that we must consider it on the merits.

II

Under the provision of the Antiterrorism and Effective Death Penalty Act (AEDPA) at issue here, a federal habeas court may grant relief only if the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). As noted above, the state trial court concluded that the plea offer itself—as opposed to Fauber's rejection of it—was entirely irrelevant. The California Supreme Court affirmed the exclusion of the plea offer evidence on direct appeal, finding "no violation of constitutional guarantees." *People v. Fauber*, 2 Cal. 4th 792, 856 (1992).

A

The Eighth and Fourteenth Amendments require that a capital defendant be permitted to introduce any relevant mitigating evidence during the penalty phase of his trial. This principle, first articulated by a plurality of the Supreme Court in *Lockett*, was clearly established by a majority of the Court in *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). By the time of Fauber's trial in 1987, the Court had also clearly established that evidence showing that a defendant would not pose a danger if spared the death penalty must be admitted under *Lockett*. *See Skipper v. South Carolina*, 476 U.S. 1, 5 (1986). Here, the State's plea offer was evidence suggesting it had determined, at some point in the case, that Fauber was not so likely to kill again that he must be executed to prevent future violence.

The Supreme Court has held that the relevance of such evidence is "underscored" when the State "specifically relies on a prediction of future dangerousness in asking for the death penalty." *Skipper*, 476 U.S. at 5 n.1. In *Skipper*, the

state court refused to admit evidence from which the jury could infer that the defendant would not be violent in prison. *Id.* at 3. With this ruling in hand, the prosecutor then argued that the defendant would likely cause disciplinary problems and rape other inmates if he were sentenced to life in prison. *Id.* The Court held that the defendant's evidence must be deemed relevant and potentially mitigating and that its exclusion violated *Lockett*. *Id.* at 5.

In Fauber's case, the State's prediction was even more dire. During closing arguments, the prosecutor explicitly told the jury that Fauber was "a man who, if given the opportunity, will kill again." Just as in *Skipper*, the prosecutor argued that death was the only appropriate penalty after successfully excluding evidence that would have rebutted that very claim. And, as the Supreme Court recognized in *Skipper*, the manifest unfairness of this tactic confirms the relevance of the plea offer evidence.

The California Supreme Court concluded that Fauber's plea offer was not relevant mitigating evidence because the offer was "susceptible of numerous inferences" and did not unequivocally show that Fauber was not likely to be violent in prison. 2 Cal. 4th at 857. As a factual matter, the court was correct: The plea offer could have reflected an assessment of Fauber's future dangerousness, an attempt at leniency, or the prosecutor's reluctance to go to trial. But the mere fact that a jury could draw different inferences from a piece of evidence does not render it irrelevant. By the time of Fauber's direct appeal, the Supreme Court had clearly established that evidence is relevant under *Lockett* whenever it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *McKoy v. North Carolina*, 494 U.S. 433, 440

(1990) (internal quotation marks omitted). The State's willingness to offer a plea deal with a life sentence made it more probable that Fauber did not pose an unacceptably high risk of killing again in prison. And the plea offer evidence easily meets this low bar even if the offer was motivated primarily by other considerations.

## B

The State offers three reasons why we should reject this conclusion and dismiss Fauber's claim. None of them are persuasive.

*First*, the State notes that Fauber cannot point to a Supreme Court decision specifically holding that plea offers are relevant mitigating evidence under *Lockett*. The majority opinion relies heavily on this argument, warning that we are not permitted to frame the Supreme Court's precedents at "a high level of generality." Maj. op. at 36 (quoting *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (per curiam)). But the Supreme Court has also instructed that AEDPA's demand for clearly established law can be satisfied by a general standard; the statute "does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (internal quotation marks omitted). This is particularly true when the Court has adopted a broad rule—such as requiring the admission of *any* relevant mitigating evidence—and there are potentially infinite forms that such evidence could take. Here, Fauber argues that evidence of a prior plea offer must be admitted when the prosecutor relies on a prediction of future dangerousness in arguing for the death penalty. He need not identify a Supreme Court decision addressing this narrow factual circumstance to prevail on his claim.

The majority recites a long list of mitigators that the Supreme Court has recognized under *Lockett*, pointing out that it does not include plea offer evidence. Maj. op. at 37. But the breadth of this list merely confirms that the *Lockett* rule is expansive and should not be applied rigidly in the AEDPA context. In fact, the only specific category of potentially mitigating evidence that the Supreme Court has held excludable under *Lockett* is evidence of "residual doubt" as to the defendant's guilt. *Oregon v. Guzek*, 546 U.S. 517, 523–27 (2006); *see also Franklin v. Lynaugh*, 487 U.S. 164, 172–73 (1988) (plurality opinion). As the Court pointed out in *Guzek*, such evidence is logically irrelevant to the sentencing-phase inquiry because the defendant's commission of the offense was already conclusively determined at the guilt phase. 546 U.S. at 526. The same cannot be said about the plea offer evidence in this case.

*Second*, the State argues that the plea offer is irrelevant because it represents only the opinion of the District Attorney's office. The State notes that a prosecutor is categorically prohibited from expressing the alternative view, that is, his personal belief that a defendant deserves the death penalty. Hence, the State reasons, the prosecutor's contrary view must be legally irrelevant.

The State's argument relies on a faulty premise. The rule prohibiting prosecutors from offering their personal view of a defendant's guilt rests on principles of fairness, not relevance. It was created to prevent prosecutors from invoking their authority and credibility to sway juries and obtain unreliable convictions, as both the Supreme Court and our court have recognized. *See Berger v. United States*, 295 U.S. 78, 88 (1935); *United States v. McKoy*, 771 F.2d 1207, 1211–12 (9th Cir. 1985). We therefore cannot infer

from the prohibition against expressing personal views of guilt that the District Attorney's assessment of a defendant's potential future dangerousness is irrelevant to the jury's decision. To the contrary, it is entirely reasonable for a jury to expect that, when making charging decisions concerning the death penalty, a prosecutor will take into account the risk that a defendant will be violent in the future.

This is not to say that a plea offer must invariably be admitted in any capital case to show in general terms that "the prosecution believed that a death sentence was not warranted." *Hitchcock v. Secretary, Florida Department of Corrections*, 745 F.3d 476, 480 (11th Cir. 2014). Here, the offer was admissible for the specific purpose of showing the District Attorney's implicit evaluation of Fauber's future dangerousness. The prosecutor's prediction that Fauber would kill again if spared the death penalty put the issue squarely before the jury, and Fauber was entitled to present any relevant evidence that could rebut this argument.

*Third*, and finally, the State points out that other state and federal courts have held that plea offers are not relevant mitigating evidence. But only one of those cases addressed the argument presented here—that a plea offer is admissible to rebut a prosecutor's claim of future dangerousness. In *Wright v. Bell*, 619 F.3d 586 (6th Cir. 2010), the Sixth Circuit rejected this argument, concluding that "nothing in the alleged plea offer constitutes relevant evidence that Wright would not pose a danger if given a life sentence." *Id.* at 601. Instead, a plea offer "might indicate only that the state believed its important interests in judicial efficiency and finality of judgments were sufficient to outweigh any potential risk associated with a life sentence, not that those risks did not exist." *Id.* Like the California Supreme Court in Fauber's case, the Sixth Circuit erroneously concluded

that a piece of evidence is irrelevant simply because it is susceptible to multiple inferences. As discussed above, this reasoning is in clear conflict with the expansive definition of relevance that the Supreme Court established in *McKoy*. *See* 494 U.S. at 440.

In the two other federal circuit court decisions to address the admissibility of plea offers under *Lockett*, the defendants argued that the offers demonstrated the prosecutor's belief that their crimes did not deserve the death penalty, but they could not offer any more specific reason why the plea offers were relevant. *See Hitchcock*, 745 F.3d at 480; *Owens v. Guida*, 549 F.3d 399, 420 (6th Cir. 2008). Thus, we should not be surprised that the *Hitchcock* court saw no mitigating value in the mere fact that the defendant "would not have received a death sentence if only he had accepted the plea offer." 745 F.3d at 482. And even in that case, one judge cautioned against overreading the majority opinion. *See id.* at 488 (Wilson, J., concurring in the judgment) ("[E]ven if the Majority is correct about the irrelevance of plea negotiations in this case, such negotiations may be relevant for a host of other reasons that should be evaluated as they arise."). In *Owens*, the Sixth Circuit relied on the same flawed reasoning that appeared in *Wright*, holding that the plea offer was inadmissible because the record did not show whether the offer reflected a judgment that the defendant did not deserve death or, instead, merely a desire to conserve prosecutorial resources. 549 F.3d at 420.

The issue of future dangerousness appeared in only two of the cited state court decisions, and never in the context of a *Lockett* claim. In one case, the defendant argued that the prosecutor's prediction of future dangerousness amounted to misconduct. *See Wisehart v. State*, 693 N.E.2d 23, 60 (Ind. 1998). The other involved a challenge to the evidence

supporting the aggravating circumstance that the defendant constituted a continuing threat to society. *See Ross v. State*, 717 P.2d 117, 123 (Okla. Crim. App. 1986). In each case, the court's brief discussion of the plea offer evidence did not address whether the offer might have been relevant to rebut the prosecutor's future dangerousness argument. *See id.* at 122; *Wisehart*, 693 N.E.2d at 64.

The majority opinion contends that the exclusion of the plea offer evidence was a permissible application of California Evidence Code § 352. It suggests that admitting the evidence would have required testimony from the prosecutor, the defense attorney, and Fauber, and that these ancillary proceedings might have confused or misled the jury. Maj. op. 41–42.

I agree with the majority that *Lockett* does not prevent States from applying rules such as California Evidence Code § 352 during penalty-phase proceedings, but the majority vastly overstates the complications that might have arisen from admitting the plea offer evidence in this case. Recall that Fauber argued in the state trial court that both the plea offer itself and his rejection of it were relevant. Testimony from Fauber or his attorney would have been required only if the jury needed to know Fauber's reasons for *rejecting* the offer. The claim at issue in this appeal depends entirely on the prosecutor's decision to *make* the offer. The only additional evidence required would be testimony regarding his reasons for making the offer and later seeking the death penalty. As discussed further below, the plea offer evidence has significant probative value, and the California Supreme Court could not reasonably have determined that its value was substantially outweighed by the risk of confusion from the prosecutor's limited testimony.

## III

If a petitioner establishes that the state court unreasonably applied clearly established federal law, a federal habeas court must determine whether the error was harmless. When the state court has not considered the harmlessness issue, AEDPA's deferential standard of review does not apply. Instead, the petitioner is entitled to relief if he can show that the exclusion had a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Because the California Supreme Court found no error in the exclusion of the plea offer evidence, it did not consider whether the error was harmless. Thus, only the *Brecht* standard applies to Fauber's claim. I would hold that the exclusion of the plea offer had a substantial and injurious effect on the jury's verdict and that Fauber is therefore entitled to relief.

The prosecutor's prediction that Fauber would kill again likely played a critical role in the jury's decision to impose the death penalty. Empirical research has shown that "[f]uture dangerousness appears to be one of the primary determinants of capital-sentencing outcomes." Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559–60 (1998). The majority places substantial weight on the other killings that the government sought to prove during the penalty phase. Maj. op. at 45–46. But those acts of violence—to the extent they were in fact proved—were relevant primarily because they bore on Fauber's future dangerousness. The prosecutor argued that Fauber had killed three people in as many months during the summer of 1986 and, in his closing argument, asked the jury to infer that Fauber would do so again. The plea offer evidence would have blunted this future dangerousness argument by suggesting that the

District Attorney's office did not believe Fauber actually posed so great a risk of future violence.

At a hearing outside the presence of the jury, the prosecutor explained that, at the time he made the offer to Fauber, the District Attorney's office did not have enough evidence to convict Buckley and Rowan. The prosecutor evidently believed that the benefit of securing Fauber's testimony against his co-conspirators outweighed the risk that Fauber would kill again. Presumably, the trial judge would have permitted the prosecutor to testify or introduce evidence of this calculus, and the jury could have decided how much weight to give to the plea offer. The prosecutor, at least, believed that the evidence would have damaged his case, as he repeatedly told the judge that it was "extremely prejudicial." The prosecutor was particularly concerned about appearing to be a hypocrite in front of the jury, and he might have decided to avoid making a future dangerousness argument altogether. Without that argument, the evidence related to the Church murder and the Dowdy disappearance loses much of its force.[2]

The remainder of the State's case in aggravation was far from overwhelming. The circumstances of the Urell murder did not make Fauber's case an obvious candidate for the

---

[2] Although the majority purports to give the plea offer evidence the full mitigating value that Fauber claims, it suggests that introduction of the plea offer evidence might have actually harmed Fauber's case because it would have exposed him to damaging cross-examination. Maj. op. 42–43. In doing so, the majority conflates the two theories of relevance that Fauber put forward before the trial court. This appeal involves only the claim that the plea offer itself, rather than Fauber's rejection of it, was relevant admissible evidence. Thus, there would be no need for Fauber to testify as to his reasons for rejecting the offer and no risk of cross-examination.

death penalty. Fauber's actions did not risk harming anyone other than his intended victim, and the crime, while violent, was not especially cruel or heinous. In fact, Urell's killing occupied only 11 transcript pages of the prosecutor's 64-page closing argument during the penalty phase.

On the other side of the equation, the State and the majority acknowledge that Fauber put on a robust case in mitigation. Maj. op. at 47–48. His trial counsel called three experts and over twenty character witnesses, many of whom testified to Fauber's good character and stated that they would stand by him even after his conviction. The majority contends that, because this mitigating evidence was so persuasive, the plea offer evidence was unlikely to have made a difference. The majority has it backwards: The strength of Fauber's case in mitigation supports his argument that exclusion of the plea offer evidence was prejudicial. If the balance between aggravating and mitigating factors was already close in the minds of the jurors, the addition of the plea offer evidence was more likely to tip the scales in favor of a life sentence.[3]

\* \* \*

The California Supreme Court's decision affirming the exclusion of Fauber's plea offer evidence during the penalty phase involved an unreasonable application of clearly established federal law, and the error was not harmless under *Brecht*. Accordingly, I would reverse the district court's

---

[3] In fact, we have direct evidence from the jury that this case was a close call. During penalty-phase deliberations, the jurors submitted a note asking whether, if the jury hung, the penalty phase would be repeated or Fauber would instead receive a sentence of life in prison. At the very least, this evidence suggests that the jury was not immediately unanimous in its decision to impose the death penalty.

decision in part and grant Fauber's habeas petition as to his death sentence.